

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 27, 2025**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| RICHARD ELWOOD ALLEN, | § | Case No. 22-20178-rlj7 |
| | § | |
| Debtor. | § | |
| _____ | § | _____ |
| | § | |
| MATTHEW KETELHUT and KASEY KETELHUT, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adversary No. 22-02005 |
| | § | |
| RICHARD ELWOOD ALLEN, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Matthew Ketelhut and Kasey Ketelhut ("the Ketelhuts") filed this adversary proceeding

seeking the Court's determination, under sections 523(a)(2)(A), (a)(4), and (a)(6) of the

Bankruptcy Code, that the debt owed to them by chapter 7 debtor, Richard Elwood Allen

("Allen"), should be declared nondischargeable. Allen filed for chapter 7 bankruptcy on

1

September 26, 2022. The Ketelhuts filed their complaint here on December 17, 2022. Trial was

held on August 19 and 20, 2024. The Court has jurisdiction over this matter under 28 U.S.C.

§ 1334(b); this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I)–(J). Venue is proper

under 28 U.S.C. §§ 1408 and 1409. This Memorandum Opinion contains the Court's findings of

fact and conclusions of law as required by Bankruptcy Rule 7052.

The Ketelhuts contend that Allen is indebted to them for charges resulting from his

company's botched installation of a swimming pool at their home. They allege that

representations made to them by Allen and his daughter, Leslie, were so brazenly false as to

make the damages a nondischargeable debt under sections 523(a)(2)(A), (a)(4), and (a)(6) of the

Bankruptcy Code.

To underscore their claim for damages and to further support their request that their

claims be declared nondischargeable, the Ketelhuts contend Allen's conduct was unconscionable

and constitutes a violation of the Texas Deceptive Trade Practices Act (DTPA) and, pointedly, the

Texas Construction Trust Fund Statute.

Allen generally denies that his actions render any debt to the Ketelhuts nondischargeable

or violate the DTPA. He also contends his affirmative defense under section 162.031 of the Texas

Construction Trust Fund Statute precludes his liability under that statute.

As set forth below, the Court concludes that the Ketelhuts have not proven that their debt

should be declared nondischargeable under sections 523(a)(2)(A), (a)(4), or (a)(6). The Court

therefore denies the relief requested by the plaintiffs.

# I.

## Statement of Facts

This case centers on representations made by Allen and his daughter, Leslie Allen, to the Ketelhuts concerning the installation of a pool at the Ketelhuts' home in Canyon, Texas. Allen is a resident of Amarillo, Texas and ran a pool service business as a sole proprietor under the name RV Pools & Spas ("RV Pools"). Allen testified that he has worked in the pool services industry since 1969 and has built hundreds of pools in various areas over his career. He has lived and worked out of Amarillo since 2021.[1] Leslie Allen, his daughter, worked for RV Pools, handling administrative aspects of the business and acting as a point of contact for current and potential customers. Though contested, it cannot seriously be disputed that Leslie was an employee of RV Pools. Allen testified that she worked in sales and received commissions, signed the contracts with customers, and solicited business for RV Pools.

The Ketelhuts are residents of Canyon, Texas in Randall County. Compl. ¶ 2, ECF No. 1.[2] They were aware of Allen's pool services from a yard sign. The Ketelhuts then went to look at pools the company had done and asked around about the company. The Ketelhuts admit they were aware that there had been issues in the past with several pools relating to tiling, grout work, and the leveling of pools, but that when they contacted Allen, they were assured that the pool would be of excellent quality and that the previous issues had been caused by a specific contractor who was no longer with the company and who would not be used for the Ketelhuts' pool. Compl. ¶ 6, ECF No. 1.

---

[1] Allen admits that he was involved in the pool construction business at the time of the events at issue but states that he is no longer involved in the construction and installation of swimming pools and spas. *See* Allen's Answer ¶ 3, ECF No. 7.

[2] "ECF No." refers to the numbered docket entry in Adversary No. 22-02005, unless otherwise stated.

Leslie Allen visited the Ketelhuts' home to discuss the pool's design, logistics of installation, and the need for a formal contract. Allen's Answer ¶ 6, ECF No. 7. Reassured by Leslie's representations, the Ketelhuts entered into a written contract with RV Pools on June 18, 2021 for construction of a gunite pool.[3] The agreed-to price was $76,400. Joint Pre-Trial Order 2, ECF No. 48. Construction started in August of 2021. The Ketelhuts have paid $72,580 of the contract amount. *Id.*

After the work began, the Ketelhuts discovered that the problematic contractor—who Leslie had assured them would not be working on their pool—actually was part of the crew installing their pool. They confronted Allen about this and were again assured that their pool would be finished in an excellent fashion and that Allen would be actively watching and supervising the job. Compl. ¶¶ 6, 10, ECF No. 1.

The Ketelhuts say they messaged Leslie several times about issues with the job—such as the stone work, incomplete work, and missing plumbing/electrical equipment—and though Leslie assured them someone would come out to address these issues, no one ever did. When the Ketelhuts continued to express concerns about the pool's construction, Leslie reassured them that the problems would be fixed before pouring concrete. The Ketelhuts both testified that workers came out in mid-October of 2021 to work on the tile, coping, and rock and that Leslie once again assured them that the company would have workers return to complete the work. The Ketelhuts testified they continued to make attempts to contact the company about this but received a response less and less. By late November, workers had not returned, and Mrs. Ketelhut contacted Leslie once more.

---

[3] The parties testified that in this context "gunite" and "shotcrete" are interchangeable terms regarding the material used and type of pool constructed on the Ketelhuts' property.

On December 6, 2021, Leslie did respond, texting the Ketelhuts and stating the pool

"absolutely is not going to crack" and "I guarantee you the pool does not need to be tore out."

Allen admitted in his testimony that he was aware that Leslie made these statements to the

Ketelhuts about cracking, but that he did not contact the Ketelhuts to discuss the accuracy of

Leslie's statements, even after admonishing Leslie privately for making such representations.

When an RV Pools representative contacted the Ketelhuts on December 8, 2021, the Ketelhuts

responded by advising the company it should not come back to finish the job. Additionally, the

Ketelhuts complained they never received pool equipment that they paid for, the price of which

was included in the contract. Allen admitted that certain equipment was never delivered.

After telling RV Pools not to return, the Ketelhuts hired another contractor to tear out the

existing work and redo their pool for around an additional $70,000.[4] The Ketelhuts argue that but

for the representations and assurances made by RV Pools they never would have entered into the

contract with RV Pools and thus would not have suffered damages from the cost of having to

redo the work, repair their yard, and the money they lost on the RV Pool contract for the

incomplete and defective work. Compl. ¶ 8, ECF No. 1.

Allen argues that the Ketelhuts prevented him from addressing the construction issues by

barring his company from the property and that the Ketelhuts did not give him enough time to

make repairs before removing him from the job. Allen testified that he had health and money

troubles that contributed to his failure to timely return to the job, but that he always intended to

fix the pool and complete the job, and never intended to mislead the Ketelhuts.[5] When asked at

---

[4] The Ketelhuts' testimony conflicts with the complaint, which states that the replacement cost was over $200,000.
Compl. ¶ 8, ECF No. 1
[5] Allen testified that he had a heart attack six to seven months *after* the Ketelhuts removed RV Pools from the job.

trial why the crew did not return after the curing period/normal timeframe to do any repairs, Allen could not give a clear answer.

In their complaint, the Ketelhuts demanded proof from Allen of how the funds they had paid under the contract to RV Pools had been used. Compl. ¶ 24, ECF No. 1. The Ketelhuts testified that they had received no receipts or breakdown of how the funds had been allocated as of the time of trial. Allen testified he had issues with the bank cooperating to provide deposit slips or invoices to track the Ketelhuts' money but that he used the money for related costs of the Ketelhut pool and for expenses on other jobs.

In sum, the representations and statements at issue include:

Pre-Contract:

- Representations about Allen's performance as a contractor and the excellent quality of his pools, and his outstanding record of performance in Texas

- Representations that defects in other pools installed by RV Pools were caused by a former "employee" who would not be working on the Ketelhuts' pool

During Construction/Post-Contract:

- Allen's promise, after the Ketelhuts discovered the former employee working on their pool, to closely watch over the employee and his assurance the work would be done in an "excellent" fashion

- When the Ketelhuts discovered alleged issues with the stone, rebar, and concrete work, as well as missing plumbing and electrical equipment, Leslie's assurance that RV Pools would fix the problems before pouring concrete

- Leslie's assurance that the Ketelhuts' pool would not crack and that the pool would not need to be torn out

Allen and RV Pools filed chapter 7 bankruptcy on September 26, 2022. It is important to note that the case, now over two years old, is designated as a "no-asset" case; there are no assets recoverable for the benefit of creditors, including the Ketelhuts.

II.

Conclusions of Law

The Bankruptcy Code requires that an individual debtor be discharged of his or her debts

unless one of the statutory grounds for denial of that discharge is proven. 11 U.S.C. § 727(a); *see*

*Simmons v. Bohanna (In re Bohanna)*, No. 18-40847, 2019 WL 7580173, at *8 (Bankr. E.D.

Tex. Nov. 15, 2019). Denying a debtor's discharge is an extreme remedy. *See Pher Partners v.*

*Womble (In re Womble)*, 289 B.R. 836, 845 (Bankr. N.D. Tex. 2003) (citing *Rosen v. Bezner*,

996 F.2d 1527, 1531 (3d Cir. 1993)). Only "very specific and serious infractions" warrant

denying discharge. *Martin Marietta Materials Sw., Inc. v. Lee (In re Lee)*, 309 B.R. 468, 476

(Bankr. W.D. Tex. 2004) (citing *Ichinose v. Homer Nat'l Bank (In re Ichinose)*, 946 F.2d 1169,

1172 (5th Cir. 1991)).

Exceptions to a debtor's discharge under section 727 "are construed strictly against the

creditor and liberally in favor of the debtor." *Laughlin v. Nouveau Body & Tan, L.L.C. (In re*

*Laughlin)*, 602 F.3d 417, 421 (5th Cir. 2010) (quoting *Cadle Co. v. Duncan (In re Duncan)*, 562

F.3d 688, 695 (5th Cir. 2009)). "The same construction principles favoring a debtor are imposed

in an action to determine the dischargeability of a particular debt." *In re Bohanna*, 2019 WL

7580173, at *9. Whether a particular debt is dischargeable—as opposed to a discharge of all

debts—is governed by section 523 of the Bankruptcy Code. The standard of proof for denying a

discharge under section 727 and the dischargeability of a particular debt under section 523 is a

preponderance of the evidence. *See In re Duncan*, 562 F.3d at 695; *Grogan v. Garner*, 498 U.S.

279, 287–88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Sharpe*, 351 B.R. 409, 422 (Bankr.

N.D. Tex. 2006).

7

Before addressing the Ketelhuts' claims under section 523, the Court considers Allen's responsibility for statements made by Leslie and whether the alleged conduct by Allen, or conduct imputed to him, constitutes a violation of the DTPA or a violation of the Texas Construction Trust Fund Statute.

A.

### Allen's Liability for Leslie Allen's Statements

Central to this dischargeability question is whether Allen may be held liable for his daughter Leslie Allen's statements and representations to the Ketelhuts. During trial, Allen confirmed that he operated RV Pools as a sole proprietorship—under Texas law, this means Allen is personally liable for any debts or liabilities of RV Pools. A sole proprietorship is "[a] business in which one person owns all the assets, owes all the liabilities, and operates in his or her personal capacity," and has no separate legal existence distinct from the operator of the business. *Black's Law Dictionary* (9th ed. 2009). This type of business is not a separate legal entity, such as a corporation, partnership, or LLC; under Texas law, a sole proprietorship is viewed as one and the same as the person who is the proprietor. *See Rex Real Estate I, L.P. v. Rex Real Estate Exchange, Inc.*, 80 F.4th 607, 617 (5th Cir. 2023); *In re Boyd*, No. 17-40426-ELM, 2024 WL 557927, at *12 (Bankr. N.D. Tex. Feb. 12, 2024); *Ideal Lease Serv., Inc. v. Amoco Prod. Co., Inc.*, 662 S.W.2d 951, 952 (Tex. 1983) ("[A] sole proprietorship has a legal existence only in the identity of the sole proprietor.").

Thus, for liability purposes, Allen is one and the same as RV Pools and may be held liable in his personal capacity for any actions or debts arising from the business, including actions by RV Pools' agents.

Agency is a legal concept that depends on the existence of: (1) manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is in control of the undertaking. *See In re Kalisch*, 413 B.R. 115, 130 (Bankr. S.D.N.Y. 2008). A party may be held liable for the acts of their agent if the agent's actions arose under express or implied actual authority, apparent authority, or even by ratification by the principal of the agent's actions. Thus, even if a principal did not expressly intend for an agent to make a certain assurance or take a certain action, the principal may still be liable for the repercussions of the agent's action.

Actual authority "arises from a communication by the principal to the agent [while] [a]pparent authority arises from communication by the principal to a third party." *In re Anzalduas Bus. Park, L.P.*, 494 B.R. 704, 714 (Bankr. S.D. Tex. 2013) (citing *Gaines, et al. v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007)). Actual authority includes both express and implied authority. *See Pasant v. Jackson Nat. Life Ins. Co.*, 52 F.3d 94, 97 (5th Cir. 1995). Express authority exists when "the principal has made it clear to the agent that he wants the act…done." *Id*. Implied authority exists when "there is no proof of express authority, but appearances justify a finding that in some manner the agent was authorized; in other words, there is circumstantial proof of actual authority." *Id*. For example, implied authority may arise by: (1) "some indication from the principal that the agent possesses the authority; (2) from being the necessary implication of an expressly authorized act; [or] (3) from a previous course of dealing." *Id*.

For apparent authority, "there is the basic requirement that the principal be responsible for the information that comes to the mind of the third person…Thus, either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such a belief." *Lubbock Feed Lots, Inc. v. Iowa Beef*

*Processors, Inc.*, 630 F.2d 250, 265 n.16 (5th Cir. 1980) (citing Restatement (Second) of Agency § 27 (1958)). Under *apparent* authority, a principal may be held liable for acts of an agent that the principal did not expressly authorize; however, if the principal's actions, or the nature of the agent's position, represent to the third party that the agent *does* have such authority, whether or not the agent had *actual* authority is irrelevant, and the principal may still be held liable for the agent's actions. *See In re Quinlivan*, 347 B.R. 811, 817 (Bankr. E.D. La. 2006), *aff'd*, No. CIVA 04-2055, 2007 WL 1970980 (E.D. La. June 29, 2007).

A principal also may be liable for the acts of his agent by his ratification of the agent's actions. "Under Texas law, ratification is the 'affirmance by a person of a prior act which when performed did not bind him, but which was professedly done on his account, whereby the act is given effect as if originally authorized by him.'" *Quinlivan*, 347 B.R. at 820. Thus, even if the agent's actions were not authorized, if the principal ratifies such action after the fact, the principal is treated as if the agent *were* authorized and is liable for the actions. Such ratification does not need to be explicit approval; rather, this can be shown by "conduct that justifies a reasonable assumption that the person so consents." Restatement (Third) Of Agency § 4.01 (2006).

Leslie Allen was an agent of Allen through implied actual authority and apparent authority. Additionally, regardless if Leslie was authorized to make the representations she made to the Ketelhuts, Allen ratified the statements about "cracking" and whether the pool needed to be torn out and thus is liable for the consequences of these statements.

First, the evidence supports that Leslie was an agent of RV Pools because the principal, Allen, created this relationship and Leslie accepted it, with the understanding that she was an agent of RV Pools. Leslie was an employee of the company; the evidence shows that she was

authorized by Allen to sign contracts, handle administrative tasks, and communicate with clients

before and during the construction process. Thus, Leslie was an agent of RV Pools at the time the

company interacted with the Ketelhuts.

There is no evidence to support that Allen made it clear to Leslie that he wanted the

specific representations at issue to be made. In fact, he testified that Leslie did not have authority

for the representation she made about "guaranteeing the pool will not crack." However, Allen

admits that Leslie was the point of contact for the Ketelhuts and signed their contract with RV

Pools. Thus, while this may not amount to express actual authority for Leslie to make the

statements, her position with RV Pools gives rise to implied actual authority.

As an RV Pools authorized agent who handled negotiating and signing the contracts and

who acted as the main point of contact between clients and the company both before and during

construction, Leslie was impliedly authorized to communicate to the Ketelhuts regarding

questions they had during the construction process, concerns about work product or delivery of

parts, and work on the property. Allen represented that this was how the company had operated

in the past with previous clients, supporting a continuous course of dealing where Leslie acted as

a representative of the company. Leslie's role was impliedly authorized through a continued

course of dealing and as a necessary implication of her expressly authorized position with RV

Pools.

Even if the Court did not find that Leslie had *actual* authority to represent RV Pools, she

did have *apparent* authority. Allen's actions as principal reasonably represented to a third party,

the Ketelhuts, that Leslie was authorized to represent the company and discuss the construction

process and any questions of clients. Allen admits Leslie had authority to handle contracts and be

a point of contact for customers. It is reasonable that the Ketelhuts relied on and assumed Leslie

had authority to speak on behalf of RV Pools regarding their concerns before and after

construction began on their property.

Further support of Leslie's apparent authority lies in the fact that Allen knew Leslie made

representations to the Ketelhuts and that the Ketelhuts were looking to Leslie and Allen for their

expertise on pool construction. Yet, when he did not agree with what Leslie conveyed to them, he

did not contact the Ketelhuts or otherwise act to correct the information presented to them. Allen

allowing the Ketelhuts to believe statements made by Leslie supports a finding of apparent

authority, so that Allen would be liable for representations by Leslie on behalf of the company

even if not expressly authorized. Allen choosing to not correct the representation made to the

Ketelhuts by his agent constitutes conduct that justifies a reasonable assumption that Allen

consented to the Ketelhuts believing these representations about their pool; this supports the

conclusion that Allen ratified Leslie's statements.

Allen operated RV Pools as a sole proprietorship, and Leslie Allen acted as an agent of

the business. Via implied actual authority, apparent authority, and ratification, Allen is

responsible for the acts and statements by Leslie as an agent of RV Pools.

B.

## Texas Deceptive Trade Practices Act

The Ketelhuts claim that Allen's conduct, including conduct imputed to him, constitutes a

violation of section 17.45(5) of the DTPA, which in turn serves as a basis to preclude discharge

under section 523(a)(2)(A) and section 523(a)(6) of the Bankruptcy Code.

Allen's conduct, however, and that attributed to him via imputed liability, does not

constitute a violation of section 17.45(5) of the DTPA.

"There are three elements to a DTPA claim: '(1) the plaintiff is a consumer; (2) the defendant engaged in false, misleading, or deceptive acts; and (3) these acts constituted a producing cause of the consumer's damages.'" *In re Frazin*, 732 F.3d 313, 323 (5th Cir. 2013) (quoting *Hugh Symons Grp., plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir. 2002)).

First, (1) a "consumer" under the DTPA is "an individual ... who seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code Ann. § 17.45(4). "Goods" are "tangible chattels or real property purchased or leased for use," while a "service" is defined as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." Tex. Bus. & Com. Code Ann. §§ 17.45(1)–(2); *see also In re Carroll*, 464 B.R. 293, 326 (Bankr. N.D. Tex. 2011), *aff'd sub nom. Carroll v. Farooqi*, 486 B.R. 718 (N.D. Tex. 2013) ("Texas courts have held that when a plaintiff has claims arising from a transaction where the ultimate objective of the transaction is the purchase of a good or service, a claim concerning the transaction also concerns the good or service for the purposes of the DTPA.").

As to element (2), section 17.46(a) of the DTPA provides that "'false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division....' Subsection (b) then goes on to define certain specific acts as 'false, misleading, or deceptive.'" *In re Carroll*, 464 B.R. at 327.

Section 17.45(5) sets forth one of the enumerated acts defined as "false, misleading or deceptive," specifically "unconscionable action[s] or course[s] of action." Tex. Bus. & Com. Code Ann. § 17.45(5). Such unconscionable conduct exists where "an act or practice…, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id*. The movant must show that the "resulting

unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001) (quotation omitted). However, a violation of section 17.45(5) can be established without any showing of intent to deceive,[6] and a movant does not need to prove that the defendant acted intentionally, knowingly, or with conscious indifference. *See In re Bairrington*, 183 B.R. 754, 759–60 (Bankr. W.D. Tex. 1995); *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998) ("Unconscionability under the DTPA is an objective standard for which scienter is irrelevant.").

Even so, "[a]n allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA." *Shakeri v. ADT Security Servs., Inc.*, 816 F.3d 283, 295 (5th Cir. 2016) (quoting *Ashford Dev., Inc. v. USLife Real Estate Servs. Corp.*, 661 S.W.2d 933, 935 (Tex. 1983)). Instead, "the inquiry is whether the alleged unconscionable conduct 'could have resulted in the absence of a contract between the parties.'" *Id.* (quoting *Crawford v. Ace Sign, Inc.,* 917 S.W.2d 12, 13 (Tex. 1996) (per curiam)). The Fifth Circuit has interpreted Texas law to mean that "where 'allegedly unconscionable statements' are made but where the breach of the contract causes the harm, a plaintiff cannot maintain a claim for unconscionable conduct under the DTPA." *Id.* (quoting *Malsom v. Match.com, L.L.C.*, 540 F. App'x 412, 415 (5th Cir. 2013)).

Here, the Ketelhuts assert that Allen violated the DTPA through "unconscionable conduct" under section 17.45(5). First, the Ketelhuts are (1) consumers under the DTPA because they contracted with RV Pools for a service (to construct their pool). The Ketelhuts assert that

---

[6] A "violation of the Texas Deceptive Trade Practices Act, at least with respect to unconscionable actions, misrepresentations based on subdivision 17.46(b)(5) and (7) or 'knowing violations,' can be founded on behavior that lacks all of the required elements necessary to support a finding of non-dischargeability under §§ 523(a)(2)(A) or (6)." *In re Bairrington*, 183 B.R. 754, 761 (Bankr. W.D. Tex. 1995). However, "[t]his does not mean that conduct that constitutes actual fraud under 523(a)(2)(A), or perhaps in an appropriate circumstance, willful and malicious acts under § 523(a)(6), cannot also constitute a deceptive trade practice within the meaning of the DTPA." *Id.*

14

Allen's and RV Pools' agents' behavior constitutes "unconscionable conduct" under section 17.45(5), which would satisfy element (2) of a DTPA claim for false, misleading, or deceptive acts or practices. Specifically, they allege they were misled about the ability of the company to construct their pool, the workers involved, and the timing and manner of repairs during construction—and that these actions satisfy element (3) as the cause of their damages, which include the costs of repairing and redoing the pool with another contractor after encountering issues with RV Pools.

While the Ketelhuts have shown that elements (1) and (3) of the DTPA claim are met, the tangle here is element (2). Following Fifth Circuit and Texas precedent, the question is whether the alleged behavior constitutes unconscionable conduct under the DTPA or, instead, is a mere breach of contract. If the alleged unconscionable conduct still would have occurred in the absence of a contract between the parties, then this may meet the test. If not, element (2) is not met.

Here, the alleged unconscionable conduct stems from the breach of the contract between RV Pools and the Ketelhuts. This conduct includes representations about the quality of RV Pools' work, what workers would be on the job, and the timing and responses relating to issues during construction. Without the agreement between the parties to construct this pool, such conduct would not have occurred, including negotiating the contract, the specifying of workers, the delivery of equipment, and the communications regarding the timing and quality of the work. The damages arising from this conduct stem from a breach of contract. *See Robinson v. Match.com, L.L.C.*, No. 3:10-CV-2651-L, 2012 WL 5007777, at *5 (N.D. Tex. Oct. 17, 2012) (The court noted that "[t]he statements themselves did not cause any harm. The failure to run the advertisement (the breach of the contract) actually caused the lost profits, and that injury is

15

governed by contract law, not the DTPA."), *aff'd sub nom. Malsom v. Match.com, L.L.C.*, 540 F.

App'x 412 (5th Cir. 2013). The Ketelhuts have therefore failed to satisfy element (2)—

unconscionable actions per section 17.45(5)—of their DTPA claim.

The Ketelhuts' DTPA claim fails. The alleged DTPA violation does not, therefore, factor

into the analysis of the Ketelhuts' claims under section 523.

C.

Texas Construction Trust Fund Statute (Tex. Prop. Code Ann. § 162.031)

The Ketelhuts argue that Allen's conduct, or conduct imputed to him by RV Pools'

agents, constitutes a violation of section 162.031 of the Texas Construction Trust Fund Statute,

which in turn serves as a basis to preclude discharge under sections 523(a)(2)(A), 523(a)(4) and

523(a)(6) of the Bankruptcy Code.

The Texas Construction Trust Fund Statute imposes criminal penalties on trustees who

misapply construction trust funds. *See In re Nicholas*, 956 F.2d 110, 111–12 (5th Cir. 1992).

"Payments received on construction contracts for the improvement of real property are

designated as 'trust funds,' and the recipient of those funds…is deemed 'trustee' of those funds."

*Id*. at 111. The Fifth Circuit has held that "the Texas Construction Trust Fund Statute [may

create] fiduciary duties encompassed by section 523(a)(4) of the Bankruptcy Code." *In re Coley*,

354 B.R. 798, 800 (Bankr. N.D. Tex. 2006) ("Such fiduciary duties are defined by the prohibited

activity—using construction trust funds for purposes other than paying the identified

beneficiaries or other expenses 'directly related to the construction project.'"); *but see In re

Allen*, No. 13-37143, 2014 WL 5689603, at *8 (Bankr. S.D. Tex. Nov. 4, 2014) ("[The] Fifth

Circuit elaborated on its prior rulings holding that the Texas Construction Trust Fund Act does

not [always] create the type of fiduciary relationship required under § 523(a)(4)."). Whether a

16

contractor is deemed a fiduciary for purposes of section 523 under the statute hinges on whether

the contractor misapplied the funds in question. *See In re Allen*, 2014 WL 5689603, at *8

(quoting *In re Tran*, 151 F.3d 339, 343–344 (5th Cir. 1998)) ("We held that, absent such an

affirmative requirement, the subject statute did not make fiduciaries out of all contractors for the

purposes of § 523(a)(4), but rather made fiduciaries of only those contractors who diverted funds

with the intent to defraud.").

     Under the statute,

> A trustee who, *intentionally* or *knowingly* or *with intent to defraud*, directly or
> indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully
> paying all current or past due obligations incurred by the trustee to the beneficiaries
> of the trust funds, has **misapplied** the trust funds.

Tex. Prop. Code Ann. § 162.031(a) (emphasis added).

     A trustee acts with "intent to defraud" (for purposes of section 162.031) when he retains,

uses, disburses, or diverts trust funds with the intent to deprive the beneficiaries of the trust

funds. Tex. Prop. Code Ann. § 162.005(1)(A); *In re Lee*, 230 B.R. 810, 812 (Bankr. N.D. Tex.

1999). A court may also find intent to defraud where a trustee fails to establish or maintain a

construction account as required by section 162.006 or fails to establish or maintain an account

record for the construction account as required by section 162.007. Tex. Prop. Code Ann.

§ 162.005(1)(B); *In re Molinar*, No. 21-31109-SWE-7, 2023 WL 4414409, at *6 (Bankr. N.D.

Tex. July 7, 2023); *but see In re Hann*, 544 B.R. 326, 337 (Bankr. S.D. Tex. 2016) (discussing

that the "level of mental culpability" to find a civil violation of the Texas Construction Trust

Fund Act may be less than what is required "for a nondischargeable debt for defalcation under 11

U.S.C. § 523(a)(4).").

     The statute includes affirmative defenses to a trustee's liability for misapplication if: (1)

the proceeds of the trust fund are "used by the trustee to pay the trustee's actual expenses directly

related to the construction..."; (2) the trustee has a reasonable, good faith belief that the beneficiary is not entitled to such proceeds; or (3) the trustee pays the beneficiaries "all trust funds which they are entitled to receive" within 30 days of being notified of a criminal investigation. Tex. Prop. Code Ann. § 162.031(b), (c); *In re Nicholas*, 956 F.2d 110, 112 (5th Cir. 1992).

As to the first defense, the payment of actual expenses directly related to the construction or improvement of the project is "open-ended." *Id*. at 113–14 (discussing how a bankruptcy court "found no violation of § 523(a)(4) because all of the money [from the construction project] went into the operation of this business. [The court is] not dealing with an individual who took money from the contractor...which he diverted for his own use or...for some frivolous use not connected with the operation of this business...there is absolutely no testimony that anything happened with this money other than that it was used to pay bills in the corporation."). Funds used for business overhead and necessary expenses to keep a business running may be considered for this defense to preclude a trustee's liability. *See In re Thornhill*, No. 19-20005, 2019 WL 4795601, at *8 n.73 (Bankr. E.D. Tex. Sept. 30, 2019) ("The term 'directly related' is not as restrictive as it seems. The exception, as interpreted by the Fifth Circuit, permits a contractor to spend trust funds 'on expenses related to general business overhead' without liability, including spending such funds on projects other than the one for which they were received."); *see also In re Chapman*, No. 14-40831-mxm-7, 2016 WL 2728868, at *8 (Bankr. N.D. Tex. May 6, 2016) ("The Fifth Circuit has interpreted this affirmative defense to protect a trustee if he uses trust funds to pay overhead expenses of the failing company (such as telephone bills or salaries) or even if he diverts funds to other company projects in order to keep the struggling business alive.").

Within the context of bankruptcy proceedings, the burden of proof does not fall solely on a trustee seeking to assert an affirmative defense; "[b]ecause the Texas statute permits application of trust fund receipts for 'actual expenses directly related' to the project…a beneficiary seeking to avail itself of § 523(a)(4) must adduce some evidence that funds were misapplied under this test." *In re Nicholas*, 956 F.2d 110, 114 (5th Cir. 1992).

Here, Allen is a trustee within the context of the Texas Construction Trust Fund Statute because he received payments from the Ketelhuts for a construction project for the improvement of their real property. Tex. Prop. Code Ann. § 162.002. The Ketelhuts are the beneficiaries. Tex. Prop. Code Ann. § 162.003(b).

Allen admitted at trial that he did not have records or maintain a trust account as required by the statute. However, because an affirmative defense applies, the Court has not considered whether Allen misapplied funds under the statute, which would arise from his failure to maintain a construction trust account—or any records for such an account—and thus whether that was an "intent to defraud" within the context of the Texas Construction Trust Fund Statute under section 162.005(1)(B), imposing statutory fiduciary duties on Allen as a contractor.

Although Allen failed to maintain a trust account with records, he asserts the section-162.031 defense that the payment funds were used to pay actual expenses related to the construction project and operations of RV Pools and that he had no reason to remit the funds back to the Ketelhuts. Allen credibly testified that the funds were used to pay actual expenses of the company and that he at all times believed in good faith that he was spending the funds appropriately. No other evidence, from the Ketelhuts or Allen, was produced showing that these funds were used for a different or improper purpose. Thus, even though Allen did not produce evidence showing he maintained records or a construction trust account—which would support

the Ketelhuts' argument that he did misapply the funds—the affirmative defense under section

162.031 of the Texas Construction Trust Fund Statute applies to preclude Allen's liability. *See

also In re Morris*, No. 09-50082-RLJ-7, 2011 WL 2693966, at *7 (Bankr. N.D. Tex. July 11,

2011) ("Morris's inability to specifically account for his use of the payments made to him by the

Shahs is troubling….While Morris's banking practices and inability to specifically account for

the use of the Shahs' payments are problematic and, to some degree, disturbing, they do not

sufficiently inform the fraud analysis. They imply at most that Morris had no business doing the

job because he had neither the necessary experience nor financial wherewithal to handle the

project. It does not mean he did not intend to perform.").

Allen's conduct, and that attributed to him via imputed liability, does not constitute a

violation of the Texas Construction Trust Fund Statute because his affirmative defense under

section 162.031(b) applies. *See* Tex. Prop. Code Ann. § 162.031(b). Thus, Allen's conduct in

relation to the statute does not factor into the Court's analysis of the asserted section 523(a)

claims.[7]

## D.

### § 523(a)(2)(A)

The Ketelhuts ask the Court to declare the debt owed to them was obtained under false

pretenses, by RV Pools' false representations, or by actual fraud and is thus nondischargeable

under section 523(a)(2)(A) of the Bankruptcy Code.

The Court concludes that the Ketelhuts have not satisfied the elements of section

523(a)(2)(A) to preclude discharge. Section 523(a)(2)(A) precludes the discharge of debts "for

money, property, services, or an extension, renewal, or refinancing of credit, to the extent

---

[7] Even if the Court did find that Allen had violated the statute and no defenses applied, this is not enough on its own to deny discharge. Rather, this would factor into the Court's analysis of intent and good faith under section 523(a)(4).

obtained by…false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Such misrepresentations must be "knowingly and fraudulently made." *In re Clem*, 583 B.R. 329, 383 (Bankr. N.D. Tex. 2017).

 *1. False Pretenses and False Representations*

 When analyzing whether a debt was obtained by false pretenses or by a false representation, courts employ a five-part test: (1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the debtor made the representation with the intent to deceive; (4) this representation was justifiably relied on; and (5) the plaintiff sustained a loss as a proximate result of the representation. *See In re Howley*, No. 23-31029-sgj7, 2024 WL 409126, at *8 (Bankr. N.D. Tex. Feb. 2, 2024). Courts often use the terms "false pretenses" and "false representations" interchangeably in this context, applying the same five-part analysis. *See In re Clem*, 583 B.R. at 383–84. When courts separately address "false pretenses," they define it as "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to debtor." *In re Clem*, 583 B.R. at 383–84. This may include "written or oral misrepresentations, or conduct which creates or fosters in the proposed lender or creditor a 'false impression' [including] 'conduct and material omissions.'" *Id*.

 For the first element, whether the debtor made a representation, the representation need not include an overt act. If a debtor has a duty to act, then silence or omission may be construed as a fraudulent misrepresentation. *See id*. at 383. Misrepresentations may also be made by conduct, rather than a verbal or written promise. *Id*. Thus, courts consider whether the circumstances in the aggregate present a picture of deceptive conduct on the part of a debtor,

which betrays an intent on the part of the debtor to deceive his creditors. *See In re Sharpe*, 351 B.R. at 422–23. Further, section "523(a)(2)(A) turns on how the money was obtained, not who committed fraud to obtain it…[t]he debt must result from someone's fraud, but Congress was 'agnosti[c]' about who committed it." *In re Desouza*, 659 B.R. 288, 297 (Bankr. E.D. Tex. 2024) ("This Court therefore [requires]…some form of partnership or agency under state law in order to hold Defendant responsible for the nondischargeable fraud of another under § 523(a)(2)(A)."); *see also Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.)*, 239 F.3d 746, 751 (5th Cir. 2001) ("[I]f a debt arises from fraud and the debtor is liable for that debt under state partnership law, the debt is nondischargeable under § 523(a)(2)(A)."). This is because section 523(a)(2)(A) "prevents an innocent debtor from discharging liability for the fraud of his partners, regardless whether he receives a monetary benefit." *Id.* at 751.

For element (3), the intent to deceive, intent may be inferred from a reckless disregard for the truth or falsity of the statement, combined with the sheer magnitude of the resulting misrepresentation. *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005) (citing *In re Norris*, 70 F.3d 27 (5th Cir. 1995)). Thus, a plaintiff does not necessarily need to prove actual intent if the circumstances show a reckless disregard by the debtor that has a significant effect on the plaintiff. To make a statement with reckless disregard, the debtor must make the statement without caring whether it is true or false. *See Reckless or gross disregard for truth*, 2F Bankr. Service L. Ed. § 27:277. Courts have found reckless disregard in instances where the parties were suspicious that they may be receiving stolen funds but chose not to investigate and continue spending the money, as well as where a debtor admitted they had not read or understood a disclosure statement before signing it even though the debtor knew the plaintiffs would reasonably rely on the statement. *See In re Burk*, 583 B.R. 655, 668 (Bankr. N.D. Miss. 2018),

*aff'd sub nom. Smith v. Mid-S. Maint., Inc.*, 363 F. Supp. 3d 701 (N.D. Miss. 2019), *aff'd sub nom. Matter of Smith*, 789 F. App'x 478 (5th Cir. 2020); *In re Melendez*, 589 B.R. 260, 266–67 (Bankr. E.D. Pa. 2018). However, a debtor's honest belief, even if unreasonable, that a representation is true does not amount to an intent to deceive. *See In re Clem*, 583 B.R. at 383; *see also Reckless or gross disregard for truth*, 2F Bankr. Service L. Ed. § 27:277 ("Unfounded optimism in the face of a difficult financial situation does not rise to the level of reckless disregard for the truth.").

As to element (4), reliance by the plaintiff, courts require "justifiable" reliance, which is something less than "reasonable" reliance. *See In re Sharpe*, 351 B.R. at 423. Thus, the inquiry focuses on "whether the falsity of the representation was or should have been readily apparent to the individual to whom it was made. This is a less exacting standard than 'reasonable' reliance, which would focus on whether reliance would have been reasonable to the hypothetical average person." 4 COLLIER ON BANKRUPTCY ¶ 523.08 (16th 2024). Even though "justifiable" reliance may be something less than "reasonable" reliance, there are limits. For example, a "plaintiff may not blindly rely upon a misrepresentation, the falsity of which would be obvious to the plaintiff had he or she used her senses to make a cursory examination or investigation." *In re Sharpe*, 351 B.R. at 423. Additionally, "where [the plaintiff] has discovered something that should serve as a warning that he is being deceived, ... [the plaintiff is] required to make an investigation of his own." *Id*. (quoting *Field v. Mans*, 516 U.S. 59, 71–72 (1995)); *but see In re Hurst*, 337 B.R. 125, 133–34 (Bankr. N.D. Tex. 2005) ("The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent or obvious or there are 'red flags' indicating such reliance is unwarranted.").

Here, the Ketelhuts have proven some but not all of the elements of a section

523(a)(2)(A) claim. First, the debts in question do fall within the definitions of "property" and

"services." Within the context of section 523(a)(2)(A),

> property…denotes something subject to ownership, transfer, or exclusive possession and enjoyment, which may be brought within the dominion and control of a court through some recognized process. This is certainly the full extent of the word's meaning as employed in ordinary speech and business and the same significance attaches to it in many carefully prepared writings.

4 COLLIER ON BANKRUPTCY ¶ 523.08 (16th 2024) (quoting *Gleason v. Thaw*, 236 U.S. 558, 35 S.

Ct. 287, 59 L. Ed. 717 (1915)). For "services" in this context,

> professional services, such as those of an attorney or physician or hospital, as well as any type of work and labor, obtained by means of fraudulent representations, are within the scope of section 523(a)(2)(A). Use of the word "services," without any modifying adjective, makes it clear that services of any kind whatsoever are included.

4 COLLIER ON BANKRUPTCY ¶ 523.08 (16th 2024). Here, the debts claimed by the Ketelhuts

arose from the contract with RV Pools to construct a pool on their property and to provide the

pool equipment agreed to and paid for. Thus, these debts arise from property and services under

section 523(a)(2)(A).

As to the first element, Allen and Leslie did make representations on behalf of RV Pools

before and during construction, including statements about which RV Pools' employees would be

working on the job, the construction supervision, the quality of the pool and necessity for repairs,

and whether the company would return to the Ketelhuts' property to fix alleged defects.

The Ketelhuts have also proven elements (4) and (5) of section 523(a)(2)(A). For element

(4), the Ketelhuts justifiably relied on the representations. It would not have been readily

apparent to the Ketelhuts that any of the representations were false—these were statements by

RV Pools' agents regarding the type of work to be performed and when, what the quality of the

work would look like, and who would be performing the work. It was reasonable for them to trust the opinion of the company representatives on these matters. Even though the Ketelhuts were aware there were some issues with previous pools built by RV Pools, they were told these were due to a previous employee who would not work on their pool, which would justify them relying on this. The Ketelhuts later catching this specific employee working on their pool may have been a red flag, but Allen reassured them that he would supervise the work and that they had nothing to worry about. Thus, the Ketelhuts allowed the work to continue. These facts do not rise to the level of being readily apparent that these representations were false so that it would not be justifiable to rely on them. Thus, the Ketelhuts justifiably relied on the representations by RV Pools.

Further, the Ketelhuts did, for element (5), sustain a loss as a proximate result of these representations. But for entering into the contract with RV Pools, they would not have suffered these damages. The Ketelhuts argue they relied on these representations throughout the construction process, so that they not only would never have entered into the contract but would have terminated the work sooner if they had not trusted the representations about delivering the equipment, the construction workers, and fixing the complained-about issues. Because they trusted these representations, they suffered higher damage costs resulting from having the work torn out to redo their pool and repair their yard for an additional $70,000.

However, the Ketelhuts have not shown sufficient evidence to meet elements (2) or (3). There is insufficient evidence to support element (2)—the debtor knowing the representations were false at the time they were made. For example, Leslie made the representation that RV Pools guaranteed the pool would not crack and would not need to be torn out. At trial, there was no testimony from Leslie or other evidence to show her intent at the time she made these

statements. Allen testified that he corrected her on this point later when he learned what she had

said and admits he did not then inform the Ketelhuts they had been misled; however, this does

not equate to evidence that the debtor knew the representation was false *at the time it was made*.

The Ketelhuts also argue that Allen knew the statements about the excellent quality of the pools

and construction work were false because of evidence of previous RV Pools' clients who had

issues with their pools. Allen counters in his testimony that these were only a few instances and

overall he has not had major issues, with similar complaints on an estimated ten percent of the

pools he has worked on. Neither party presents sufficient evidence to show Allen's statements to

be untrue, or that Allen did not believe his company could produce a satisfactory pool for the

Ketelhuts.[8]

Further, and most important, there is not sufficient evidence to prove these

representations were made with the intent to deceive or with reckless disregard to meet element

(3). That Allen knew he was having money problems is not enough to show that these

representations were made with intent to deceive. In fact, he stated at trial that he always

intended to return to complete the work and never intended to deceive the Ketelhuts. This does

not rise to the level of reckless disregard. Allen credibly testified this was his honest belief,

and—even if unreasonable—without proof otherwise, an honest but unreasonable belief does not

constitute reckless disregard.

The Ketelhuts have not provided sufficient evidence of element (2) that the debtor knew

these representations were false at the time they were made or element (3) that these

representations were made with the intent to deceive or reckless disregard for the truth.

---

[8] The Ketelhuts presented testimony from previous disgruntled clients of RV Pools, but this is not necessarily indicative of the overall business, that Allen was unable to provide the pool the Ketelhuts contracted for, or that Allen believed he could not provide the pool to the standard contracted for.

Therefore, the Ketelhuts have not proven the necessary elements of false pretenses and representations to preclude discharge of their debt under section 523(a)(2)(A).

    *2.  Actual Fraud*

    While included in section 523(a)(2)(A), actual fraud is considered separately from false pretenses or representations. *See In re Howley*, 2024 WL 409126, at *8. For actual fraud, courts do not necessarily review the same five-part test as for false pretenses and representations; the Supreme Court has distinguished that there does not need to be a misrepresentation to constitute actual fraud. *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 366, 136 S. Ct. 1581, 194 L. Ed. 2d 655 (2016); *see also Howley*, 2024 WL 409126, at *9 ("To be clear, the five-element test for a § 523(a)(2)(A) claim is still good law, so long as the court applying the test is not doing so when assessing the requirements for *actual fraud*. The test clearly still applies to assessing the requirements for *false representations….Husky* only stands for the proposition that § 523(a)(2)(A) actual fraud does not *require* a false representation.") (emphasis in original). Rather, actual fraud is "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another…something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." 4 COLLIER ON BANKRUPTCY ¶ 523.08; *but see In re Morris*, 2011 WL 2693966, at *5 ("[F]raud must exist at the debt's inception—a promise to perform acts in the future is not a qualifying misrepresentation merely because the promise is subsequently breached."). The key element for actual fraud is the scienter requirement—the underlying conduct must involve a "moral turpitude or intentional wrong." *In re Hunt*, 605 B.R. 758, 777–78 (Bankr. N.D. Tex. 2019); *see also Desouza*, 659 B.R. at 296 ("As with false pretenses or representations, reckless indifference to the truth can in some situations

constitute a sufficient showing of wrongful intent to find actual fraud."). Thus, constructive fraud is not actual fraud. 4 COLLIER ON BANKRUPTCY ¶ 523.08.

Here, the actual fraud claim fails for the same reasons as do the false pretenses and false representations claims. The evidence does not support a finding of an intentional wrong at the time any of these statements were made. Even if the representations later turned out to be false and Allen did not follow through on promises made to the Ketelhuts, this does not constitute actual fraud under section 523 in the making of these representations. *See In re Ryan*, 443 B.R. 395, 409 (Bankr. N.D. Tex. 2010) ("Other representations cited by Plaintiffs concern the future state of things. For example, Plaintiffs attack statements allegedly made by Debtor that the work would be performed in a good and workmanlike manner. Plaintiffs allege that, in fact, the construction fell below this standard. Such a statement, however, has no immediate truth or falsity—it is at most a promise respecting what will be done. That is, it is neither true nor false at the time it is made. If such a promise is broken, it may give rise to an action for breach of contract, but not fraud."). Thus, the Ketelhuts have not proven actual fraud to preclude the discharge of their debt under section 523(a)(2)(A).

### E.

### § 523(a)(4)

Section 523(a)(4) prevents the discharge of any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. § 523(a)(4). The Ketelhuts object to the discharge of their debt because they argue Allen committed fraud and defalcation while acting as a fiduciary under the Texas Construction Trust Fund Statute; additionally, they argue Allen's actions constitute embezzlement and larceny.

28

*1. Fraud or Defalcation*

To show non-dischargeability under section 523(a)(4) for fraud or defalcation, a creditor must prove by a preponderance of the evidence that (1) the debt was caused by fraud or defalcation, and (2) there was a fiduciary relationship between the parties at the time the debt was created. *In re Parr*, 347 B.R. 561, 564–65 (Bankr. N.D. Tex. 2006). Fraud in the context of section 523(a)(4) requires a creditor to show by a preponderance of the evidence that the debtor acted in bad faith, knew of the falsity, and intended to deceive his creditor, and that the debtor's fraud caused the debt. *See In re Berry*, 174 B.R. 449, 453 (Bankr. N.D. Tex. 1994).

To meet element (1), an intent to deceive may be inferred from "a reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *In re Acosta*, 406 F.3d at 372 (quoting *In re Norris*, 70 F.3d at 30 n.12). "Nevertheless, an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive." *In re Clem*, 583 B.R. at 383. The Fifth Circuit defines defalcation "as a 'willful neglect of duty, even if not accompanied by fraud or embezzlement,' and is adjudicated 'essentially [using] a recklessness standard.'" *In re Howley*, 2024 WL 409126, at *10 (quoting *LSP Inv. P'ship v. Bennett* (*In re Bennett*), 989 F.2d 779, 790 (5th Cir. 1993)). The burden of proof rests with the creditor to establish defalcation by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

For element (2), the fiduciary relationship must be one arising out of an express (or formal) duty imposed by statute or pursuant to a traditional common law fiduciary duty already recognized by federal courts. *See In re Morris*, 2011 WL 479105, at *3; *In re Parr*, 347 B.R. at 564–65 ("A fiduciary under § 523(a)(4) does not refer to any relationship involving confidence,

trust or good faith, rather § 523(a)(4) concerns a relationship arising out of a technical or express

trust."). Thus, while Texas courts have recognized the existence of informal fiduciary

relationships, these do not satisfy element (2) in the context of section 523(a)(4). *See In re*

*Howley*, 2024 WL 409126, at *12; *see also Berry*, 174 B.R. at 454 ("[A] debtor is not a fiduciary,

within the meaning of § 523(a)(4), when the debtor is merely in the position of an agent, bailee,

broker, factor, partner, or other similarly situated person, unless some additional fact is shown.").

Instead, this duty must stem from an express statutory duty or be of the sort of "traditional

fiduciary relationships" already recognized, such as between a trustee-beneficiary, directors and

majority shareholders of a corporation, business partners, joint adventurers, and principals and

agents. *In re Howley*, 2024 WL 409126, at *11. This trust must exist "prior to the wrong and

without reference to it." *In re Hicks*, 384 B.R. 443, 451 (Bankr. N.D. Tex. 2008). However,

"because '[s]tatutory trusts...can satisfy the dictates of § 523(a)(4),' state law may in some

instances create a fiduciary relationship, a breach of which results in nondischargeability under

§ 523(a)(4)." *In re Ozcelebi*, 640 B.R. 884, 901 (Bankr. S.D. Tex. 2022).

      The evidence here does not support a finding of either fraud or defalcation. While there

may be a fiduciary relationship between Allen and the Ketelhuts under the Texas Construction

Trust Fund Statute,[9] and an argument that the debt in question arose from the complained-of

actions, the evidence falls short of proving bad faith, knowledge of falsity, or intent to deceive.

*See In re Chapman*, 2016 WL 2728868, at *8. Allen testified that he always intended to complete

the job as promised. Even if it was not entirely reasonable for Allen to believe the pool would be

finished to the Ketelhuts' satisfaction due to Allen's financial or health issues, there is no proof

that RV Pools was incapable of doing so. The evidence does not support a finding of fraud.

---

[9] See Section II, C of this opinion.

The Ketelhuts' defalcation argument fails for the same reasons as the fraud claim. The Ketelhuts argue there is a statutorily-created fiduciary duty under the Texas Construction Trust Fund Statute, but even under the recklessness standard, there is not sufficient proof to support that Allen was reckless in his representations to the Ketelhuts. Thus, Allen has not engaged in defalcation.

### 2. Embezzlement or Larceny

The section 523(a)(4) exception to discharge may still apply outside of a fiduciary relationship when a defendant's actions constitute "embezzlement" or "larceny." *In re Ozcelebi*, 640 B.R. at 901. Under section 523(a)(4), there is no requirement for the offense of larceny or embezzlement that debtor be acting in a fiduciary capacity. *See In re Hayden*, 248 B.R. 519, 525 (Bankr. N.D. Tex. 2000) (citing 4 COLLIER ON BANKRUPTCY ¶ 523.10[2] (15th ed. rev. 1998)).

Embezzlement is defined "for purposes of § 523(a)(4) as the 'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998) (quoting 3 COLLIER ON BANKRUPTCY ¶ 523.14(3), 523-106 (15th ed. 1981)). To meet the section 523(a)(4) definition of embezzlement, there must be proof of the debtor's fraudulent intent in taking the property. *See Miller*, 156 F.3d at 602–03; *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996) ("A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud."); *In re Hann*, 544 B.R. at 337 ("To meet the definition of 'embezzlement,' there must be proof of the debtor's fraudulent intent in taking the property."). Texas bankruptcy courts have found that embezzlement requires a showing of three elements: (1) the debtor appropriated funds, (2) the appropriation was for the debtor's use or benefit, and (3)

the debtor did the appropriation with fraudulent intent. *See In re Hayden*, 248 B.R. at 525.

Further, under section "523(a)(4) a debtor may be held liable for the embezzlement or larceny of

a conspirator, partner, or agent as determined under state law." *In re Desouza*, 659 B.R. at 300.

Larceny is the "fraudulent and wrongful taking and carrying away of the property of

another with intent to convert it to the taker's use and with intent to permanently deprive the

owner of such property." *In re Wells*, 368 B.R. 506, 514 (Bankr. M.D. La. 2006). Larceny

"differs from embezzlement because the initial taking of the victim's property must be unlawful.

Fraudulent intent is essential to both larceny and embezzlement." *Id*. Larceny necessarily

requires an unlawful taking. *See In re Ozcelebi*, 640 B.R. at 903 (finding that, without an

additional taking, fraudulent transfer actions which took place after the debt had already been

acquired did not constitute larceny).

The property at issue consists of the funds entrusted to Allen for the construction and

equipment. Because Allen came into possession of the Ketelhuts' money lawfully via the

construction contract, larceny is not the applicable analysis here. Instead, the Court looks to

whether Allen's actions constitute embezzlement.

The Ketelhuts have not proved embezzlement—there is not sufficient evidence that Allen

had a fraudulent intent when accepting the Ketelhuts' payments under the contract. Such an

intent may have been found had there been evidence that Allen never intended to construct the

pool, or that he knew the RV Pools employees and agents were wholly unable or unavailable to

construct the pool he advertised, or that he did not intend to complete the job when the Ketelhuts

complained of construction issues. Allen credibly testified that he always intended to return to

the job but was not allowed to do so. The Ketelhuts presented evidence of issues with previous

pools Allen had installed, but such evidence falls well short of proving Allen's fraudulent intent in connection with such other jobs.

Notably, Allen admitted the Ketelhuts did not receive the pool equipment that they paid for as part of the agreement with RV Pools. However, this is not evidence of fraudulent intent in the taking of their money—Allen reiterated that he always intended to finish the job, and the Ketelhuts do not present other pertinent evidence to show intent. This does not rise to the level of reckless disregard, as a debtor's honest belief that he intended to follow through, even if unreasonable, negates a finding of fraudulent intent. While it may have been unrealistic to assume the company would finish the work due to financial problems, the parties have not presented evidence that Allen knew he could not perform the work or that it was extremely unlikely he could.

Thus, the Ketelhuts have not proven the elements of section 523(a)(4) to render their debt nondischargeable under any of these claims.

F.

§ 523(a)(6)

The Ketelhuts ask the Court to preclude discharge of their debt under section 523(a)(6) on the basis that their debt arises from Allen's willful and malicious conduct. The Court disagrees with the Ketelhuts, as they have not satisfied the elements of section 523(a)(6) to preclude discharge.

Section 523(a)(6) provides that a debtor may not receive a discharge for debts arising from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "Entity" is broader than "person" under the Bankruptcy Code; "'person' includes an individual, partnership, and corporation, while 'entity' includes a person,

33

estate, trust, and a governmental unit." 4 COLLIER ON BANKRUPTCY ¶ 523.12 (16th 2024). Willful

and malicious injuries "are not limited to physical damage or destruction; harm to personal or

property rights is also covered." *In re Morris*, No. 13-70043-HDH-7, 2014 WL 550869, at *4

(Bankr. N.D. Tex. Feb. 12, 2014). To prevail under section 523(a)(6), a creditor must prove by a

preponderance of the evidence that the debt is not dischargeable. *See In re Keaty*, 397 F.3d 264,

270 (5th Cir. 2005); *In re Morris*, 2014 WL 550869, at *4.

In *Kawaauhau v. Geiger*, the Supreme Court held that section 523(a)(6) "applies to 'acts

done with the actual intent to cause injury,' *but excludes intentional acts that cause injury.*" *In re

Williams*, 337 F.3d 504, 508 (5th Cir. 2003) (emphasis added) (quoting *Kawaauhau v. Geiger*,

523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)); *see also In re Morris*, 2011 WL 479105,

at *3 ("The Supreme Court has made it clear that intentional torts generally require that the actor

intend the consequences of the act, not simply the act itself."). The Fifth Circuit held in *Miller*

that the "test for 'willful and malicious injury' under Section 523(a)(6)" is condensed into a

single inquiry of whether there exists "either an objective substantial certainty of harm or a

subjective motive to cause harm" on the part of the debtor. *In re Miller*, 156 F.3d 598, 606 (5th

Cir. 1998); *In re Braziel*, 653 B.R. 537, 557 (Bankr. N.D. Tex. 2023) (quoting *In re Williams*,

337 F.3d at 509). Thus, under section 523(a)(6), "willful and malicious" is a unitary concept

rather than separate elements. *See In re Hettler*, No. 02-50465-RLJ-11, 2005 WL 4225741, at *2

(Bankr. N.D. Tex. Oct. 14, 2005). A knowing breach of contract is not enough to meet this

standard; rather, the debtor must have had an actual intent to cause injury, or the circumstances

of the resulting harm were certain or almost certain to result from the debtor's actions. *See id.*

"Injuries that are negligently or recklessly inflicted are insufficient to meet the requirements of

§ 523(a)(6)." *In re Morris*, 2014 WL 550869, at *4.

34

The evidence here fails to prove that the debt arose from a willful and malicious injury under the Fifth Circuit test. The Ketelhuts did suffer an injury via the monetary cost of tearing out the work to complete the pool after RV Pools did not complete the project, and for not receiving the pool equipment they paid for. The evidence presented does not, however, rise to meet the Fifth Circuit standard for "willful and malicious" injury under section 523(a)(6). To be "willful and malicious," the debtor must have acted with a subjective motive to cause harm, or there must have been an objective substantial certainty of harm. Here, as discussed in reference to the Ketelhuts' other section 523 claims, Allen did not have the requisite intent to cause the Ketelhuts harm. Thus, the inquiry turns to whether there existed an objective certainty of harm.

The question, then, is whether the resulting harm from Allen's actions was certain or almost certain to occur. The actions at issue here include representing that the company could build an excellent pool, that specific employees would not work on the pool or cause issues with the construction, and that RV Pools would continue visiting the property to repair the construction issues the Ketelhuts complained of.

To determine if the harm was substantially certain to occur from any of the above actions, the Court looks to the expert testimony provided by Mike Copeland, an engineer the Ketelhuts hired to inspect their pool in 2022. After reviewing the construction in person and having technicians perform testing on the pool, Copeland concluded that there were defects in the construction at that stage, such as cracking, exposed rebar, and a lower-than-industry-standard PSI that could affect the structural integrity of the pool. Copeland stated that these types of issues likely arose from improper placement of the shotcrete during the application process, which would be greatly affected by whoever was holding the nozzle and directing the shotcrete.

Copeland stated that he believed the best way to repair these issues would be to redo the work but that it would be possible to chip out and replace areas where cracking had occurred. While this testimony does support that there were problems with the construction process, this is not determinative that Allen's conduct was sure to cause harm. Allen testified that he always intended to return to the property to make the repairs complained of. He explained that while cracking and voids like this do occur in the shotcrete application process, it is not abnormal, and his workers would have fixed these issues in the next stage of construction. However, he claims he was not able to make these repairs because the Ketelhuts kicked him off the job before he could do so.[10] The Ketelhuts argue that Allen had essentially abandoned the job, so they had no reason to trust that he would return. In his testimony, Allen did not present a reason why the crew did not go back out after about a month, which he admits would be around the normal time to continue the work and it would have made sense to make these repairs then.

Viewing the conduct at issue in light of the Fifth Circuit test, representations about the quality of RV Pools' work and discussions about who specifically would work on the pool do not satisfy the standard for a willful and malicious injury. *See Shakeri*, 816 F.3d at 295 (The court did not find the conduct to be unconscionable where the claim rested on the allegation that "ADT falsely advertised that its alarm system would be of high quality and would work, when the alarm system, in fact, did not work as it was supposed to under the contract." Rather, this amounted to a breach of contract claim.). The question under section 523(a)(6) is whether Allen's promise to return to make the repairs, but not doing so timely, constitutes an objective certainty of harm to the Ketelhuts *or* if it is more akin to a breach of contract.

---

[10] The evidence shows that the last time RV Pools was on the Ketelhut property working on the pool was mid-October, 2021, with the Ketelhuts telling RV Pools to not return on December 8, 2021. Both parties testified that some communication took place in between these dates, although it is not clear to what extent.

The evidence does not meet the (a)(6) test. Allen not returning to the Ketelhuts' property or sending workers to continue the pool construction in a timely manner may have led the Ketelhuts to believe they needed a different contractor, but it does not rise to an objective certainty that the Ketelhuts' pool was abandoned or that they needed to spend additional funds for a different pool company to tear out and redo their pool. At the time the Ketelhuts were promised that RV Pools would make repairs and continue the work, there was not an objective reason the company knowingly could not complete the work. While Allen testified that he did suffer health issues that began to affect his abilities in relation to RV Pools, he also testified that he did not have the heart problems discussed until several months after the Ketelhuts had already told him he was not to return to the job, so that the heart attacks would not have provided any objective certainty that RV Pools could not have completed the work.

The evidence here does not meet the Fifth Circuit test for "willful and malicious" conduct under section 523(a)(6). This charge fails. [11]

### III.

### Conclusion

The Court recognizes that its characterization of the evidence may seem too exacting in Allen's favor—after all, it is always difficult to prove fraudulent intent if the evidence is principally the plaintiff's and the defendant's testimony. A defendant's admission that he purposely or fraudulently took advantage of another rarely, if ever, happens. The Court understands that such candor cannot be expected. The Court has carefully and holistically

---

[11] *See also In re Hann*, 544 B.R. at 338 (quoting *In re Tomasek*, 175 F. App'x 662, 668 n.4 (5th Cir. 2006)) ("A debtor is not vicariously liable for the willful or malicious acts of another….'Under § 523(a)(6), it is the debtor who must act in causing the willful and malicious injury to another or the property of another entity. It has been universally held that a person's willful and malicious actions cannot be imputed to another person or entity for the purpose of holding that debt nondischargeable under § 523(a)(6).'").

considered all the facts and circumstances in assessing whether Allen's failures establish the necessary intent to declare any claim of the Ketelhuts nondischargeable. The Court concludes the evidence so considered falls short. The Court does not liquidate the Ketelhuts' claim: this is a no-asset case, and such claim is hereby discharged.

The Court denies the plaintiffs' request to find their alleged debt nondischargeable under sections 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code.

### End of Memorandum Opinion ###